**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Roslyn K. Chavda, Ph.D.

   v.                                          Civil No. 13-cv-078-LM
                                               Opinion No. 2014 DNH 162
University System of the
State of New Hampshire


**O R D E R**

In a case that has been removed from the Rockingham County

Superior Court, Roslyn Chavda, a former assistant professor at

the University of New Hampshire ("UNH"),[1] has sued in four

counts, asserting claims captioned: (1) racial discrimination

(Count I); (2) gender discrimination (Count II); (3) status

retaliation (Count III); and (4) public policy (Count IV).

Counts I-III have been brought under both Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e et seq., and New

Hampshire's Law Against Discrimination, N.H. Rev. Stat. Ann.

("RSA") ch. 354-A.  The discrimination claims Chavda asserts in

Counts I and II are based upon allegations that she was

subjected to a hostile work environment and ultimately

discharged because of her race and gender.  Count IV is a claim

for wrongful discharge, under the common law of New Hampshire.

---

[1] In this order, the court uses the acronym "UNH" to refer
both to the University of New Hampshire and to the defendant in
this case, the University System of the State of New Hampshire.

Before the court is defendant's motion for summary judgment.
Plaintiff objects.  For the reasons that follow, defendant's
motion for summary judgment is granted.

### Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law." Ponte v. Steelcase Inc., 741 F.3d
310, 319 (1st Cir. 2014) (quoting Cortés–Rivera v. Dept. of
Corr., 626 F.3d 21, 26 (1st Cir. 2010)); see also Fed. R. Civ.
P. 56(a).  When ruling on a motion for summary judgment, the
court must "view[ ] the entire record 'in the light most
hospitable to the party opposing summary judgment, indulging all
reasonable inferences in that party's favor.'" Winslow v.
Aroostook Cnty., 736 F.3d 23, 29 (1st Cir. 2013) (quoting Suarez
v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)).

"The nonmovant may defeat a summary judgment motion by
demonstrating, through submissions of evidentiary quality, that
a trialworthy issue persists." Sánchez–Rodríguez v. AT&T
Mobility P.R., Inc., 673 F.3d 1, 9 (1st Cir. 2012) (quoting
Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006)).
Thus, "[c]onclusory allegations, improbable inferences, and
unsupported speculation, are insufficient to establish a genuine

dispute of fact." Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 146 (1st Cir. 2013) (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999)). "Rather, the party seeking to avoid summary judgment must be able to point to specific, competent evidence to support his [or her] claim." Sánchez-Rodríguez, 673 F.3d at 9 (quoting Soto-Ocasio v. Fed. Ex. Corp., 150 F.3d 14, 18 (1st Cir. 1998)) (internal quotation marks omitted).

### Background

Roslyn Chavda is African American. From the fall semester of 2006 through the spring semester of 2012, she was employed by UNH as an assistant professor in the political science department ("department"). Her primary teaching responsibilities were in the department's Master of Public Administration ("MPA") program, which was directed by Dr. Mel Dubnick. He, in turn, had been a member of Chavda's dissertation committee in graduate school and was instrumental in bringing Chavda and her husband to UNH.

When Chavda was hired, UNH was in the midst of a hiring freeze. However, the department was able to get around the freeze, and hire Chavda, because of her race and UNH's ongoing efforts to enhance racial diversity on campus. The role of Chavda's race in her hiring was mentioned at the meeting where

the faculty voted to hire her.  When asked to explain what she
meant by calling her race a "reference point" for her colleagues
in the department, Chavda offered this clarification:

> A.  I think it [race] was an issue for most of
> them.
>
> Q.  Okay.  Why do you think that?
>
> A.  I think – and again I have no evidence for
> this.  I think my race set me apart from them, not
> from my perspective but from theirs.  . . .
>
> . . . .
>
> A.  I think it meant that they . . . gave me a
> little bit less support because I wasn't exactly like
> them.
>
> Q.  Gave you a little less support.  What do you
> [mean] . . .
>
> A.  At no point did they attempt . . . to . . .
> help me with teaching, help me with publishing, take
> me under their wing.  I think they made me feel like
> an other.  Now, was that because I was a black woman?
> Was that because I . . . was pregnant?  Was that
> because – I don't know.  I have no idea, but I mean
> that's what I think.

Def.'s Mem. of Law, Van Oot Aff., Ex. 1, Chavda Dep., Sept. 3,
2013 (doc. no. 10-16) 50:23–51:20.  Later in her deposition, she
reiterated the point: "I think the entire time that I've been at
UNH, I had no idea how race factored into any of this.  I had no
idea how gender factored into it."  Id. at 208:11-14.

When Chavda arrived on campus, she was pregnant with twins.
Her pregnancy resulted in complications for both Chavda and her

babies, including premature delivery.  Those complications
forced Chavda out of the classroom for several weeks, and her
classes were covered by other faculty members, including her
husband.  In the spring of 2007, Chavda had a conversation with
Dubnick concerning her pregnancy that she describes in the
following way:

> Q.  . . .  [Y]ou told him [department chair Dr.
> Warren Brown] that you had just had a conversation
> with Mel Dubnick –
>
> A.  Uh-huh.
>
> Q.  – who told you that you had screwed
> everything up by getting pregnant?
>
> A.  Yep.
>
> Q.  And that everybody was pissed at you, and
> they were sure that you had done it on purpose.
>
> A.  Uh-huh.
>
> Q.  Is that right?
>
> A.  That's correct.
>
> Q.  Okay.  And then Mel told you that, quote,
> they had plans that they were not going to be able to
> fulfill because you were unable to do what you – what
> had been planned for you?
>
> A.  Uh-huh.
>
> Q.  Is that right?
>
> A.  Yes, that's correct.

Chavda Dep. 90:11-91:5.

The terms of Chavda's employment were governed by a collective-bargaining agreement between the American Association of University Professors and UNH.  Generally speaking, that agreement provided that non-tenured faculty members such as Chavda: (1) worked under renewable one-year appointments; and (2) were evaluated annually by their departments to assess their progress on the path toward tenure.

Chavda's appointment was renewed four times, based upon: (1) evaluations and recommendations from the department's promotion and tenure committee ("P&T Committee"); and (2) separate recommendations from the department's chair.  In April of 2011, following the recommendations of both the P&T Committee (by a 7-1 vote), and the department's chair, UNH did not renew Chavda's appointment.  Instead, it offered her a one-year terminal contract for the 2011-2012 academic year, thus removing her from the tenure track.  The reasons given for that decision were her uneven performance as a teacher and her failure to publish a sufficient amount of peer-reviewed research.  Chavda concedes that her publication record was considerably weaker than those of two other junior faculty members in the department, both women, who received tenure at about the same time she was removed from the tenure track.  And, undisputed evidence from student evaluations confirms that Chavda's ratings

were consistently lower than those of other similarly situated
junior faculty members.[2]  In recognition of the difficulties
Chavda encountered during her first year at UNH, as a result of
her pregnancy, that year was not counted against her "tenure
clock," which is the amount of time generally given to a junior
faculty member to compile a record of teaching, scholarship, and
service sufficient to merit an award of tenure.

Based upon the foregoing, Chavda sued in four counts,
asserting claims for race discrimination, gender discrimination,
retaliation, and wrongful discharge.

## Discussion

In her surreply, Chavda concedes that UNH is entitled to
judgment as a matter of law on the retaliation claim she
asserted in Count III.  Accordingly, the following discussion is
limited to Chavda's discrimination claims (Counts I and II) and
her claim for wrongful discharge (Count IV).

---

[2] Specifically, Chavda's average score on the question used
by the P&T Committee to evaluate teaching effectiveness was
3.98, while the two colleagues who were granted tenure had
scores of 4.55 and 4.65, and another colleague, who, like
Chavda, was recommended for removal from the tenure track, had
an average score of 4.53.  See Doc. No. 18-19, at DEF 002735.

A. Discrimination

Chavda asserts claims for race discrimination (Count I) and gender discrimination (Count II) under both Title VII and RSA 354-A.  "Because the New Hampshire Supreme Court relies on Title VII cases to analyze claims under RSA 354-A, the court will address [Chavda's state and federal] claims together using the Title VII standard." Hubbard v. Tyco Intg. Cable Sys., Inc., 985 F. Supp. 2d 207, 218 (D.N.H. 2013) (quoting Hudson v. Dr. Michael J. O'Connell's Pain Care Ctr., Inc., 822 F. Supp. 2d 84, 92 (D.N.H. 2011)).

In Count I, Chavda states her race-discrimination claim this way: "As a direct and proximate cause [sic] of her race, Dr. Chavda was subjected to a hostile environment and, ultimately, discharged."  Compl. (doc. no. 1-1) ¶ 26.  She states her gender-discrimination claim in a similar way.  That is, Chavda claims that animus based upon her race and gender "created an attitude of hostility that, from the very outset of her employment, doomed her efforts to succeed."  Pl.'s Mem. of Law (doc. no. 12-1) 10.  In her objection to summary judgment, she describes that hostility as consisting of: (1) heightened scrutiny of her performance; and (2) assessments of her student evaluations that, in her view, unfairly failed to take into account the fact that the students she taught in the MPA program

were more likely than other students to complain about their
professors due to their own academic deficiencies.  The
principal forms of hostility she identifies in her deposition
are the failures of her senior colleagues to: (1) give her
advice on teaching; (2) invite her to write scholarly papers
with them; or (3) tell her about publication opportunities that
might be available to her.  Her theory is that because the
workplace hostility that precluded her from satisfying the
requirements for earning tenure was based upon her race and
gender, her removal from the tenure track was an act of race and
gender discrimination.  UNH is entitled to judgment as a matter
of law on Chavda's discrimination claims.

### 1. Race Discrimination (Count I)

As Chavda concedes, this is not a case that involves any
acts of hostility that directly demonstrate race-based animus.
Rather, she argues that "[u]nlike a hostile environment where
racial epithets were hurled, or she was directly impugned due to
her childbirth, the academics exercised their bias in the
confines of the P&T Committee."  Pl.'s Mem. of Law (doc. no. 12-
1) 10.  She elaborates: "[U]nlike the typical situation where
those creating the hostile atmosphere at least have the courage
to do so directly, these academics chose the cloistered

deliberations of the P&T Committee to hurl their venom, then couch[ed] their 'conclusions' in the antiseptic verbiage of the annual reviews, largely leaving Chavda to guess why her efforts to improve were fruitless." Id. at 12-13.  That argument fails for several reasons.

First, Chavda has provided no legal support for her theory that a person can be harassed, for purposes of a hostile-work-environment claim, by words or deeds of which she is entirely unaware.  And, as a practical matter, it would appear all but impossible for Chavda to establish that race- or gender-based conduct by the P&T Committee that was hidden from her "was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and [that she] in fact did perceive it to be so," Ponte, 741 F.3d at 320 (quoting Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 (1st Cir. 2007)), which is one of the elements of a hostile-work-environment claim.

Second, Chavda has produced no evidence of any racial animus on the part of any of her colleagues in the political science department.  She has produced evidence that her colleagues knew that the only reason the department was able to hire her was her race.  But, she has not produced any evidence that any member of the department was displeased by the

10

circumstances of Chavda's hiring or harbored any animosity toward African Americans specifically or people of color generally.  Although she refers to "venom" hurled by her colleagues, the only venom of which she provides any evidence consists of comments about her deficiencies in teaching, scholarship, and interactions with colleagues in the department. And, while she has produced evidence that several of her colleagues harbored serious doubts about her competence long before she was removed from the tenure track, none of those internal P&T Committee communications give any indication that her colleagues harbored racial animus.  Rather, they tend to mirror the "antiseptic verbiage of the annual reviews," Pl.'s Mem. of Law (doc. no 12-2) 13, that Chavda characterizes as camouflage for racial animus.

Finally, no reasonable jury could be persuaded by Chavda's disparate-treatment argument based upon the manner in which the P&T Committee treated her, as contrasted with the way it treated three white colleagues who were in approximately the same position on the tenure track.  Of those three, the two who were granted tenure had: (1) publication records that were "head and shoulders better than [Chavda's]," Chavda Dep. 222:5-6; and (2) student evaluations that were substantially better than Chavda's, see Doc. No. 18-19, at DEF 002735-36.

Chavda' third purported comparator, Andrew Smith, was not granted tenure, which would appear to diminish his value as a comparator in a disparate-treatment argument where the adverse employment action was UNH's decision to remove Chavda from the tenure track.  Chavda, however, identifies three differences in the way she was treated vis-à-vis Smith.

First, she argues that while the P&T Committee recommended that both she and Smith be removed from the tenure track, the committee subjected her performance to more scrutiny than Smith's.  Because both Chavda and Smith had similarly thin records of scholarly research, and Smith, in fact, had stronger student evaluations, Chavda's differential-scrutiny argument goes nowhere.  She also argues that Smith was given extra time at the end of his tenure clock, presumably to improve his record of scholarship.  But, it is undisputed that she herself was given an extra year at the start of her tenure clock, so as not to penalize her for her difficult first year.

Finally, Chavda notes that after Smith left the tenure track, he continued to be employed by the political science department as a part-time, non-tenure-track, affiliated associate professor, and she was not.  But, as to that bit of disparate treatment, Chavda and Smith were not similarly situated.  Before and during his stint as a tenure-track

12

assistant professor (which was also part-time), Smith was the director of the UNH Survey Center, and he continued in that position after he left the tenure track. Given that fact, Chavda and Smith were not situated similarly enough to turn Smith's appointment as an affiliated professor into evidence of racial bias against Chavda. See Garcia v. Bristol-Myers Squibb Co., 535 F.3d 23, 31 (1st Cir. 2008) ("To successfully allege disparate treatment, a plaintiff must show 'that others similarly situated to [her] in all relevant respects were treated differently by the employer.'") (quoting Koseris v. Rhode Island, 331 F.3d 207, 214 (1st Cir. 2003)).

The bottom line is this. UNH is entitled to judgment as a matter of law on the race-discrimination claim Chavda asserts in Count I.

### 2. Gender Discrimination (Count II)

Count II stands on much the same footing as Count I. The only real difference is the conversation in which MPA director Mel Dubnick expressed his opinion that Chavda had "screwed everything up by getting pregnant." That comment is insufficient, by a wide margin, to establish that Chavda's removal from the tenure track was a result of gender discrimination. It was a single comment, made by a non-

decisionmaker,[3] more than four years before the employment action on which Chavda bases her gender-discrimination claim. Moreover, while Chavda characterizes Dubnick's comment as expressing gender-based animus that took root at the very outset of her employment and animated every evaluation of her performance, that theory does not account for the fact that on three separate occasions, prior to its 2011 recommendation against renewing Chavda's appointment, the P&T Committee voted to recommend renewing Chavda's appointment and keeping her on the tenure track.

In sum, Chavda has failed to produce evidence from which a reasonable jury could conclude that her removal from the tenure track resulted from gender-based animus. Accordingly, UNH is entitled to judgment as a matter of law on the gender-discrimination claim Chavda asserts in Count II.

B. Wrongful Discharge (Count IV)

Count IV is Chavda's claim for wrongful discharge. The New Hampshire Supreme Court has recently described that cause of action:

---

[3] To clarify, Dubnick did have one vote on the eight-member P&T Committee, but the Committee's recommendation was the first step in a process that involved multiple evaluations and recommendations before any actual decision was made.

The prevailing rule in New Hampshire is that, absent an agreement to the contrary, employment contracts are "at-will," meaning that "both parties are free at any time to terminate the employment relationship, with or without cause." Porter v. City of Manchester, 151 N.H. 30, 37 (2004) (quotation and brackets omitted). An exception to the "at-will" rule is that even at-will employees may pursue a cause of action in tort for wrongful discharge. See id. at 37–39. In order to succeed on a wrongful discharge claim, a plaintiff must establish two elements: (1) that the discharge was "motivated by bad faith, retaliation or malice"; and (2) that the plaintiff was discharged "for performing an act that public policy would encourage or for refusing to do something that public policy would condemn." Karch v. BayBank FSB, 147 N.H. 525, 536 (2002). "Although ordinarily the issue of whether a public policy exists is a question for the jury, at times the presence or absence of such a public policy is so clear that a court may rule on its existence as a matter of law, and take the question away from the jury." Short v. School Admin. Unit 16, 136 N.H. 76, 84 (1992) (citation omitted).

Leeds v. BAE Sys., 165 N.H. 376, 379 (2013).

The court begins by noting that in this case, Chavda had accepted an appointment that specified the duration of her employment, which calls into question her status as an at-will employee. Thus, it is not at all clear that a cause of action for wrongful discharge is even available to Chavda. Cf. Dillman v. N.H. Coll., 150 N.H. 431, 434-35 (2003) (holding that reasonable jury could conclude that letter of appointment issued by academic institution, that included a duration provision, was an employment contract sufficient to support an action for breach of contract when employee was discharged prior to

expiration of the term specified in the appointment).  But, because UNH does not raise this issue and, in fact, presumes that Chavda was an employee at will, the court will make the same presumption.

Count IV falters on the second element.  In her complaint, Chavda asserts that her "termination by UNH was a direct and proximate result of her attempts to enforce academic standards and thereby improve UNH's MPA program, a policy encouraged by the State of New Hampshire."  Compl. (doc. no. 1-1) ¶ 32.  In an interrogatory answer, Chavda had this to say about the sources of the public policies underlying the second element of her wrongful-discharge claim:

> Public policy discourages penalizing performance based on dramatically disparate standards of evaluation.
>
> Public policy encourages procreation and I suffered loss of standing and stature as a result of my . . . giving birth, which standing and [stature] could not be repaired, ultimately resulting in my discharge[.]

Def.'s Mem. of Law, Van Oot Aff., Ex. 1, Chavda Dep., Ex. 4 (doc. no. 10-16), at 22.  In response to UNH's argument that "[t]he status . . . of being a female employee who has given birth to a child, while protected by public policy (including Title VII and RSA 354-A), is not an act by an employee that will satisfy the 'public policy' prong of a wrongful termination

claim," Def.'s Mem. of Law (doc. no. 10-1) 26, Chavda makes the
following argument:

> Setting aside whether or not pregnancy is akin to
> sickness, disability and age, that is simply not
> Chavda's claim.  Rather, it was the act of giving
> birth, and the perceptions that she was not performing
> that flowed from that act, upon which she relies.  The
> informality of the arrangements for class coverage,
> and her efforts to balance work, birth and premature
> twins because she was never told of the availability
> for maternity leave, . . . magnified the negative
> perception of this individual who was already faced
> with the Departmental knowledge that, but for her
> race, she would not have been hired.

Pl.'s Mem. of Law (doc. no. 12-1) 15;[4] see also Pl.'s Surreply
(doc. no. 21) 6 (explaining that Chavda "claims that, as a
result of having given birth, she was perceived as failing to
adequately perform her job, which worked to her considerable
detriment and colored the perception of her performance
throughout her employment").

There are several problems with Chavda's argument.  First,
despite having been asked to identify the sources of the public
policies underlying her claim, Chavda asserts that procreation

---

[4] Based upon Chavda's briefing, it is difficult to tell
whether she has abandoned her reliance upon a public policy that
"discourages penalizing performance based on dramatically
disparate standards of evaluation."  Because the public-policy
analysis applicable to a wrongful-discharge claim focusses on
public-policy support for the actions or inactions of the
plaintiff/employee, see Antonis v. Elecs. for Imaging, Inc., No.
07-cv-163-JL, 2008 WL 5083979, at *3 (D.N.H. Nov. 25, 2008),
whether public policy would support the manner in which UNH
evaluated Chavda is irrelevant to her claim.

is an act encouraged by public policy, but offers no legal or other support for that assertion.  Even assuming that procreation is an act supported by public policy, Chavda cannot demonstrate that she was discharged for giving birth to her twin children.  On a purely temporal basis, no reasonable jury could conclude that UNH removed her from the tenure track, in 2011, because she gave birth in 2006.  She was removed from the tenure track, by all accounts, for her shortcomings in teaching and scholarship.  Moreover, Chavda does not even argue that those shortcomings resulted from her having given birth.  Rather, she adds another link to the chain of causation, arguing that the academic record that served as the basis for her removal from the tenure track resulted, in one way or another, from negative perceptions of her among her colleagues which, in turn, resulted from her having given birth.  That chain is far too long and far too weak to support a claim for wrongful discharge that a reasonable jury could resolve in Chavda's favor.

Because Chavda cannot demonstrate that she was discharged for giving birth, UNH is entitled to judgment as a matter of law on the wrongful-discharge claim she asserts in Count IV.

**Conclusion**

For the reasons detailed above, UNH is entitled to judgment as a matter of law on all three of Chavda's claims.  Thus, its motion for summary judgment, document no. 10, is granted.  The clerk of the court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge


July 29, 2014

cc:   Lawrence B. Gormley, Esq.
      Marth Van Oot, Esq.

19